**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Rae E. Ketchum,

                Plaintiff,        Civ. No. 12-2893 (RHK/LIB)
                                            **MEMORANDUM OPINION**
v.                                      **AND ORDER**

St. Cloud Hospital,

                Defendant.

---

LeAnne D. Miller, Sarah R. Jewell, Reichert Wenner, P.A., St. Cloud, Minnesota, for Plaintiff.

John L. Greer, James P.A. Morrighan, Hughes Mathews, P.A., St. Cloud, Minnesota, for Defendant.

---

**INTRODUCTION**

In this action, Plaintiff Rae Ketchum has sued her former employer, Defendant St. Cloud Hospital ("SCH"), alleging it discriminated against her and violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, when it terminated her employment. Presently before the Court is SCH's Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion in part, dismiss the FMLA claim, and decline to exercise jurisdiction over the remaining claims.

**BACKGROUND**

Viewed in the light most favorable to Ketchum, the record reveals the following facts. SCH is a regional inpatient and outpatient medical center located in St. Cloud,

Minnesota.  Among other things, it has a Sleep Center providing testing, diagnosis, and treatment of sleep disorders such as obstructive sleep apnea and restless leg syndrome.

Ketchum began working for SCH as a registered polysomnographer (also called a sleep technician) in October 2008.  In that role, she greeted patients, set them up for sleep studies,[1] and ran tests on patients.  She generally worked an overnight shift, three days per week from 6:30 p.m. to 7:00 a.m., and spent much of her time in the Sleep Center's control room with several other technicians.  During the relevant timeframe, the Sleep Center's Director (and Ketchum's supervisor) was Bryan Bauck.  Bauck did not work the overnight shift, however, and therefore did not directly observe Ketchum's work.

Generally speaking, Ketchum performed her job satisfactorily.  In her final performance review in December 2011, which Bauck administered, she received an overall score of 2.1 out of 3.0; the review noted that in most categories she was meeting (and occasionally surpassing) expectations.  The review, however, also noted that Ketchum needed "to continue to work on her softer side," because "sometimes she has a gruff way about her that can lead patients and staff to believe she is difficult."  It further noted that her "initial reaction to things could be better handled by taking some time to think and cool down."  And the record reveals that Ketchum often had difficulty working with other Sleep Center employees and with patients.

---

[1] A sleep study is a test measuring how well a patient sleeps and responds to sleep problems. Sleep studies typically are performed overnight at sleep centers, where patients sleep in small rooms while connected to sensors measuring brain waves, eye movement, heart rate, breathing patterns, and other information; the room also usually contains a video camera and an audio system.  The patient's sleep is monitored remotely by sleep technicians from an on-site "control room," where data is recorded by computers and the technicians can see and hear what is happening while the patient sleeps.  See http://www.mayoclinic.org/tests-procedures/ polysomnography/basics/what-you-can-expect/prc-20013229 (last visited January 28, 2014).

For example, in 2010 Ketchum had an altercation with two co-workers, who reported that she had raised her voice when being assigned to a different patient room after a patient requested not to work with her. Ketchum received verbal counseling as a result of this incident. Bauck later held a meeting with Ketchum and one of the co-workers to address their ability to work together, but during that meeting the co-worker became so upset that she left the room crying. In addition, Lead Sleep Technician Shelly Carlson testified in her deposition that she received "a lot of patient complaints" about Ketchum, specifically that she "was rough or not compassionate enough," and Ketchum acknowledges being informed by Bauck that patients had complained about her.

On December 20, 2011, Ketchum was working at the Sleep Center when she began having difficulty operating one of the machines used on a patient. She grew increasingly frustrated when she could not solve the problem, and eventually telephoned Carlson at her home at approximately 11:00 p.m., which Carlson found inappropriate. Ketchum was "very upset" during the call, although she denies yelling or using obscenities. It was reported to Bauck, however, that Ketchum had yelled and used expletives during the call and had acted hostilely toward her co-workers, who were helping her troubleshoot the issue.

On January 5, 2012, Bauck met with Ketchum to discuss the events of December 20. According to Ketchum, Bauck became angry, yelling and turning "purple in the face." She responded by telling him that he was a "bad manager" and showed favoritism toward other sleep technicians. Bauck then informed Ketchum she was receiving a "verbal warning." But on February 3, 2012, she actually received a "corrective action

form," dated January 12, 2012, indicating that she had been placed on three months' probation as a result of the December 20 incident and her other performance issues discussed above. The form noted that "[f]urther disciplinary action, up to and including termination of employment, can result from any related or unrelated offenses."

Around the time of the corrective action, Ketchum began suffering recurrent sinus infections, which were triggering flare-ups in her asthma. Believing indoor air quality might be the culprit, she asked Bauck to check the Sleep Center's duct work and inquired whether it could be cleaned. Bauck said he would look into the issue, and he later consulted with the Sleep Center's maintenance department, which revealed the ducts' filters were fine; he so informed Ketchum. But when one of her co-workers also raised concerns about air quality, Ketchum mentioned the issue again. Bauck "forcefully" responded that "he was going to do no more with it" and suggested that "maybe [Ketchum] was too sick to work there." Ketchum felt "frightened" by this statement.

Ketchum then decided to find out "once and for all what was causing" her recurrent health problems. Her primary-care physician referred her to several specialists, who performed a bevy of tests and discovered a suspicious area in her left breast. She was sent for a mammogram, which revealed three masses later confirmed as malignant.

Shortly after receiving this diagnosis, Ketchum informed her co-workers and Bauck that she had breast cancer and would require time off from work. Ketchum claims that Bauck "congratulated" her, a statement she found "shocking."[2] Nevertheless, he

---

[2] In his deposition, Bauck testified that he congratulated Ketchum not for having cancer, but rather for making a commitment to return to work by a certain date. Furthermore, Ketchum

- 4 -

informed her that "[w]hatever time you need off, you will get." Ketchum subsequently underwent surgery and chemotherapy, and on April 3, 2012, she sought leave under the FMLA commencing (retroactively) on March 30, 2012; Bauck approved her request. It was initially expected that she would be out of work for approximately one month, but she later requested additional time off when her physician determined she would be unable to return until July 2012. This request, too, was approved.

On May 11, 2012, while still on leave, Ketchum visited the Sleep Center with her husband Robert and her two young grandsons, in order to check her work mailbox and "show off" her grandchildren. Three sleep technicians were working when she arrived: Patricia West, Margaret Bond, and Beth Honek. According to Ketchum, Robert waited in a staff kitchen and was nowhere near the control room during the visit, which consisted of a brief exchange of pleasantries and introductions of her grandchildren. In their depositions, however, Bond and Honek described the encounter differently.[3]

Bond testified that she observed Robert standing in the control room doorway and did not recognize him or know why he was there; he did not say anything to her or anyone else. She further testified that he frightened her, because he stared at her and Honek with "an angry kind of look." Eventually she heard Ketchum's voice and then realized that Robert was Ketchum's husband, but she was still unnerved by his presence

---

testified that she "didn't know" whether Bauck's statement was intended to be "vindictive or mean," and in fact she later called him a "hero" for observing that she was frequently sick, which led her to aggressively seek out the cause of her illness and ultimately uncover the cancer.

[3] The parties have submitted only a portion of West's deposition transcript, so her description of the encounter is unclear.

and gaze, although not sufficiently alarmed to call security. Honek also testified that Robert was standing in the control room doorway and she, too, was startled by his presence, because he "looked kind of scary" with a "stand-offish" facial appearance. When she realized Robert was Ketchum's husband, however, she exchanged pleasantries with him. Nevertheless, she later told Bond that she was scared by Robert's presence at the control room.

Regardless of these competing descriptions, it is undisputed that shortly after May 11, Bond informed West that she felt threatened by the Ketchums. West responded that right after Ketchum had been placed on probation, she (Ketchum) told West that Robert maintained a "hit list" and that Bauck was at the top of it.[4] West apparently did not take the comment seriously, but she did not tell that to Bond. And Bond reported the comment to Carlson, who quickly convened a meeting with Bond and Bauck, which Honek also attended. At that meeting, Bond told Bauck that West had informed her that he was at the top of Robert's "hit list." She also reported that she felt intimidated by Robert's presence in the control-room doorway on May 11; that Ketchum had once threatened her at work; and that she had overheard Ketchum "talk[ing] about being involved in motorcycle gangs and [those] people knowing how to make people disappear." The "combination of these things," she reported, "made [her] very

---

[4] The parties refer to this as both a "hit list" and a "kill list."

concerned." Honek, too, reported that Ketchum had told her that she (Ketchum) knew how to hide weapons and that her "motorcycle friends" knew how to hide bodies.[5]

In response, Bauck contacted David Sakariason, an SCH human resources employee, and reported that Ketchum had made threatening comments, including that she had a "kill list," knew how to hide bodies, and had access to weapons, and he "didn't want her to return" from FMLA leave. Bauck also contacted the police, discussed changing the locks at the Sleep Center, and distributed photos of Robert to staff members so they would be able to identify him. Before taking further action, however, Sakariason and Bauck met with West to attempt to corroborate what Bond had reported about the "kill list." West confirmed being told by Ketchum that she and her husband had a "kill list" and that Bauck was at the top of it, although she also told them she "didn't think [Ketchum] was serious." Unsure how to interpret West's comments, Sakariason requested a criminal background check on Ketchum and her husband. He was then provided a police report showing that in 2009, Robert was convicted of disorderly conduct for threatening two individuals he believed were trespassing on his property. The report indicated that during the incident, Robert called 911 and advised that he had a loaded AK-47 assault rifle, which he was "not afraid to use" and that he would "take care of" the trespassers himself. According to Sakariason, this report provided "corroborating" information and led him to support Bauck's decision to terminate Ketchum's employment.

---

[5] Ketchum denies ever having made a statement about a hit list or being a member of a motorcycle gang, but it is undisputed Bond and Honek *reported* these items to Bauck.

By letter dated May 25, 2012, Bauck informed Ketchum that he had become aware of "several comments that are considered threatening, intimidating and inappropriate for the workplace," including reference to the "kill list." He also noted that her interactions with her co-workers had not improved after she was placed on probation. As a result, her employment was terminated "effective immediately."

On November 1, 2012, Ketchum commenced the instant action against SCH in the Stearns County, Minnesota District Court, alleging that SCH's conduct constituted disability discrimination under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*, and violated the FMLA. Invoking federal-question jurisdiction, SCH removed the action to this Court on November 15, 2012. The parties then undertook discovery, and Ketchum amended her Complaint to add a claim for marital-status discrimination under the MHRA. Discovery is now complete, and SCH has moved for summary judgment on all of Ketchum's claims.[6] Its Motion has been fully briefed, the Court heard oral argument on January 14, 2014, and the Motion is ripe for disposition.

**STANDARD OF REVIEW**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042

---

[6] Ketchum also has filed a Motion in limine (Doc. No. 42) seeking to exclude at trial the testimony of SCH's expert witness, as well as certain testimony by Honek. In light of the Court's disposition of the instant Motion, it need not (and does not) reach the Motion in limine.

(8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

**I.     The FMLA claim**

    **A.     The FMLA generally**

The Court begins its analysis with Ketchum's FMLA claim, which provides the basis for the Court's jurisdiction.  Congress enacted the FMLA to "balance the demands of the workplace with the needs of families."  29 U.S.C. § 2601(b)(1).  It entitles an employee, during any 12-month period, to take 12 weeks of unpaid leave for medical reasons or to care for family members with serious health conditions.  § 2612(a)(1).[7]  The Act renders it unlawful for an employer to "interfere with, restrain, or deny the exercise of . . . any right provided" thereunder or to "discharge or in any other manner

---

[7] The statute applies only if (1) the plaintiff has been employed "for at least 1,250 hours of service with [her] employer during the previous 12-month period" and (2) the employer has at least 50 employees within 75 miles of the plaintiff's worksite.  29 U.S.C. § 2611(2)(A)-(B).  There is no dispute these conditions have been met here.

discriminate against any individual for opposing any practice made unlawful" by its terms. § 2615(a)(1)-(2).

The Eighth Circuit has clarified that three types of claims exist under the FMLA: entitlement, retaliation, and discrimination. See Bosley v. Cargill Meat Solutions Corp., 705 F.3d 777, 780 (8th Cir. 2013). In an "entitlement" claim, the "employee claims the denial of a benefit to which [she] is entitled under the statute," id., that is, claims her employer "refuse[d] to authorize leave under the FMLA" or took "other action to avoid responsibilities under the Act," Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012). In a "retaliation" claim, an employee asserts that her employer took adverse action against her for "oppos[ing] any practice made unlawful under the FMLA." Id. at 1005-06. Finally, in a "discrimination" claim, an employee asserts that her employer took "adverse action against [her] because [she] exercise[d] rights to which [she] is entitled under the FMLA." Id. In this scenario, "the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised [her] statutory rights, the employer discriminated against [her] in the terms and conditions of employment." Id.

It is not entirely clear which type of claim Ketchum purports to bring here. Her brief, however, suggests she is bringing an entitlement claim. In her FMLA section, Ketchum argues that despite being approved for 12 weeks of leave, her employment was "wrongfully terminated" after only eight weeks. (Mem. in Opp'n at 20.) This sounds like an entitlement claim, because she argues she did not receive all of the FMLA protection (12 weeks of leave) to which she was entitled. Furthermore, Ketchum uses the

label "interference" when describing her claim (id. at 19), and what was previously known as an interference claim is now referred to as an entitlement claim. See Bosley, 705 F.3d at 780.  Finally, Ketchum argues that she need not offer proof of discriminatory intent in order to succeed under the FMLA (Mem. in Opp'n at 19), which is true only of an entitlement claim, Pulczinski, 691 F.3d at 1005.  For these reasons, the Court will treat her FMLA claim as an entitlement claim and analyze it accordingly.

**B.     Ketchum's entitlement claim fails**

As discussed above, an FMLA entitlement claim "arises when an employer denies or interferes with an employee's substantive FMLA rights."  Hager v. Ark. Dep't of Health, 735 F.3d 1009, 1015 (8th Cir. 2013).  Unlike most other employment claims, no proof of intent is required, Ballato v. Comcast Corp., 676 F.3d 768, 772 (8th Cir. 2012), and thus an entitlement claim is not analyzed using the familiar McDonnell Douglas burden-shifting approach.  See Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 n.3 (8th Cir. 2006).  Rather, the employee's "initial burden of proof" is to "show only that . . . she was entitled to the benefit denied."  Ballato, 676 F.3d at 772.

Yet, the FMLA is not a strict-liability statute, and a plaintiff satisfying her initial burden does not automatically prevail.  Id.  Instead, "the burden shifts to the employer to prove there was a reason *unrelated to the employee's exercise of FMLA rights* for terminating [her]."  Id. (emphasis added); accord, e.g., Stallings, 447 F.3d at 1051.  An employee who takes FMLA leave simply "has no greater protection against termination for reasons unrelated to the FMLA than she did before taking the leave."  Estrada v.

Cypress Semiconductor (Minn.) Inc., 616 F.3d 866, 871 (8th Cir. 2010). As noted in Stallings:

> [E]very discharge of an employee while [she] is taking FMLA leave interferes with [her] FMLA rights. However, the mere fact of discharge *during* FMLA leave by no means demands an employer be held strictly liable for violating the FMLA's prohibition of interfering with an employee's FMLA rights. Thus, where an employer's reason for dismissal is insufficiently related to FMLA leave, the reason will not support the employee's recovery.

447 F.3d at 1050-51 (first alteration and emphasis in original; second and third alterations added) (citations omitted). Succinctly stated, if an employer can prove it would have terminated an employee even if she had not invoked the FMLA, it will not be liable. Id.; Throneberry v. McGehee Desha Cnty. Hosp., 403 F.3d 972, 979 (8th Cir. 2005).

Here, it is undisputed Ketchum was entitled to take up to 12 weeks' FMLA leave while seeking treatment for breast cancer. But she is wrong in arguing that her termination after only eight weeks' time suffices, in and of itself, to establish her claim. (Mem. in Opp'n at 20.) Rather, there exists an obvious explanation for her termination short of 12 weeks: the intervening events of May 11, 2012, and the threats (including the "kill list") reported to Bauck shortly thereafter. The fact that these events and threats were wholly disconnected from her leave scuttles her FMLA claim.

Ketchum responds that she did not engage in any of the conduct ascribed to her (id.), but that misstates the issue. The question is not whether she was "guilty as charged," so to speak, but rather whether SCH had a *good-faith belief* she had engaged in the alleged misconduct. See, e.g., Wierman v. Casey's Gen. Stores, 638 F.3d 984, 995 (8th Cir. 2011). And in the Court's view, no reasonable jury could conclude otherwise.

When Bond informed Bauck that she had overheard Ketchum "talk[ing] about being involved in motorcycle gangs and these people knowing how to make people disappear," Honek confirmed that she had heard similar statements. Moreover, Bauck did not simply take Bond at her word that West overheard Ketchum talking about a "kill list." Rather, he spoke to West who confirmed that she had, in fact, overheard such a statement.[8] Ketchum claims that West also told Bauck that she (West) did not think Ketchum was serious, but Bauck clearly took the (alleged) threats seriously, going so far as to call the police and discuss having the Sleep Center's locks changed. Furthermore, Ketchum had been placed on probation barely three months earlier for engaging in (among other things) hostility toward her co-workers. Accordingly, there is simply no reason to believe Bauck should have doubted the sincerity of Ketchum's (alleged) threats.[9]

Ketchum also points to Bauck's comment that she was "too sick to work" as evidence of interference. (Mem. in Opp'n at 21.) Yet, Bauck learned that Ketchum had cancer shortly after making this (alleged) comment, at which point he immediately informed her "[w]hatever time you need off, you will get." True to his word,

---

[8] Ketchum contends Bauck had a "conflict of interest" and should not have been involved in the investigation. But "[s]hortcomings in an investigation alone . . . are not enough to make a submissible case." Pulczinski, 691 F.3d at 1005 (citations omitted). Ketchum also questions why she was not interviewed before her employment was terminated, claiming at oral argument that Bauck (and/or Sakariason) violated SCH's past practices by terminating her employment without first questioning her. But there is no evidence in the record regarding SCH's past practices concerning investigations, and in any event, the "appropriate scope of an internal investigation . . . is a business judgment, and we do not review the rationale behind such a decision." Id.

[9] At the hearing, Ketchum asserted that Robert's poor health undermined the legitimacy of Bauck's (alleged) concerns. But she has cited no evidence indicating that Bauck had ever met Robert, let alone that he was aware Robert was suffering from health problems.

approximately one month later Bauck approved Ketchum's application for FMLA leave, and then agreed to extend it when her condition did not permit her return to work as soon as anticipated. These facts belie the notion that Bauck acted for the purpose of interfering with Ketchum's FMLA rights. The record is clear that only after the events of May 11 did he decide to terminate Ketchum's employment, the so-called "interference" here.

At bottom, the evidence simply does not undermine the conclusion that Bauck had a good-faith belief Ketchum had engaged in misconduct warranting her termination. Accordingly, SCH has "prove[d] there was a reason unrelated to [Ketchum's] exercise of FMLA rights for terminating" her employment, Ballato, 676 F.3d at 772, and her FMLA claim fails.[10]

## II. The remaining claims

The Court's subject-matter jurisdiction in this action is premised on the existence of a federal claim – namely, the FMLA claim. (See Notice of Removal ¶ 3.) Although neither party has alleged a jurisdictional basis for the state-law claims, jurisdiction over them appears to exist solely by virtue of the supplemental-jurisdiction statute, 28 U.S.C. § 1367, which provides jurisdiction over state-law claims forming part of the same "case or controversy" as federal claims.[11] But the exercise of supplemental jurisdiction is discretionary, and where all federal claims have been dismissed prior to trial, the factors

---

[10] Although Ketchum does not appear to assert an FMLA "retaliation" or "discrimination" claim, such claims would fail for the same reason: SCH terminated her employment for reasons unrelated to her invocation of the FMLA. See Pulczinski, 691 F.3d at 1007.

[11] There is no suggestion the parties are diverse, nor does that appear to be the case. (See Am. Compl. ¶¶ 1-2.)

to be considered in deciding whether to exercise such jurisdiction – judicial economy, convenience, fairness, comity, and predominance of state issues – typically militate against doing so.  E.g., Johnson v. City of Shorewood, Minn., 360 F.3d 810, 819 (8th Cir. 2004) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)); accord, e.g., United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  That is the case here.  Accordingly, the Court declines to exercise supplemental jurisdiction over Ketchum's remaining claims under the MHRA, and it will remand those claims to state court.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that SCH's Motion for Summary Judgment (Doc. No. 38) is **GRANTED IN PART**.  The Motion is **GRANTED** with respect to Ketchum's claim under the FMLA (Count II of the Amended Complaint), and that claim is **DISMISSED WITH PREJUDICE**.  The Court **DECLINES** to exercise supplemental jurisdiction over Ketchum's remaining claims under the MHRA (Count I (disability discrimination) and Count III (marital-status discrimination)), and those claims are **REMANDED** to the Stearns County District Court.  The Clerk of the Court shall mail a certified copy of this Order to the Clerk of the Stearns County District Court.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  January 30, 2014                                             s/Richard H. Kyle
                                                                              RICHARD H. KYLE
                                                                              United States District Judge